UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PATRICK B. BELL, | : | CIVIL ACTION NO. |
| | : | 3:01CV01961 (WWE) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| STOP & SHOP SUPERMARKET COMPANY, | : | |
| | : | January 12, 2004 |
| Defendant. | : | |

FILED
Jan 13  3 16 PM '04
U.S. DISTRICT COURT
NEW HAVEN, CONN

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Defendant, The Stop & Shop Supermarket Company ("Stop & Shop" or the "Company"), is entitled to judgment as a matter of law on Plaintiff Patrick Bell's ("Plaintiff's" or "Mr. Bell's") claim for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[1]

Stop & Shop discharged Mr. Bell, a former highlift operator in the Company's Grocery Distribution Center ("GDC"), for admittedly sleeping on the job in violation of clear, known and consistently enforced Company policy. Pursuant to the collective bargaining agreement's grievance procedure, Mr. Bell grieved his termination, and his union and Stop & Shop arbitrated the matter before the Connecticut State Board of Mediation and Arbitration ("CBMA"). The CBMA ruled in favor of Stop & Shop, upholding Mr. Bell's termination.

---

[1] Defendant filed a Motion for Summary Judgment on January 27, 2003. Without written findings, the Court (Warren W. Eginton, J.) denied Defendant's Motion on July 14, 2003.

Stop & Shop files the instant motion to bring to this Court's attention certain undisputed evidence that Stop & Shop treated all individuals similarly situated to Mr. Bell equally. Namely, it is undisputed that Stop & Shop has never reinstated a former employee after the Connecticut State Board of Mediation and Arbitration had upheld that individual's termination.

Case 3:01-cv-01961-EBB   Document 52   Filed 01/13/2004   Page 2 of 19

It is undisputed that Stop & Shop has immediately terminated every GDC employee found sleeping on the job. In some instances, the union grieved the discharge. During this grievance process and its ensuing negotiations, the union sometimes succeeded in convincing Stop & Shop to reinstate the employee. In other instances, the process reached arbitration before the CBMA, and, pursuant to the collective bargaining agreement, the CBMA issued a "final and binding" decision. In every instance when the CBMA has upheld the termination of a former Stop & Shop employee, Stop & Shop did not reinstate the individual. In the instant case, consistent with its practice, Stop & Shop did not reinstate Mr. Bell.

Mr. Bell claims that Stop & Shop terminated him because he is African-American. However, Mr. Bell has not introduced, and cannot introduce, any evidence that Stop & Shop's stated reason for his discharge (*i.e.*, sleeping on the job) was a pretext for race discrimination. Having no evidence to rebut Stop & Shop's legitimate, non-discriminatory reason for his termination, Plaintiff contends that Stop & Shop subjected him to stricter punishment than his Caucasian peers by reinstating some of them. However, Mr. Bell deliberately ignores the undisputed fact that Stop & Shop also reinstated African-American employees. Further, Stop & Shop declined to reinstate other terminated Caucasian employees, for whom, like Mr. Bell, the union did not successfully negotiate their reinstatement during the grievance process.

Moreover, Stop & Shop has _never_ reinstated any former employee (Caucasian or otherwise) whose termination the CBMA had upheld. For instance, of the eleven arbitration decisions by the CBMA upholding a termination between 1997 and 2003 (including all terminations regardless of the reason), Stop & Shop did not reinstate the former employee on all eleven occasions. Mr. Bell cannot refute this undisputed evidence.

2

Plaintiff simply cannot introduce any evidence to infer that Stop & Shop terminated his employment because of his race. Accordingly, Plaintiff's claim fails as a matter of law, and the Court should dismiss Plaintiff's action.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.     Stop & Shop's Strict Policy Against Sleeping On The Job And The Union Grievance Procedure**

Sleeping on the job, or "stealing time," is a terminable offense under Stop & Shop's GDC Shop Rules. *See* North Haven GDC Shop Rules, attached hereto as Exhibit A; Affidavit of Edward Ruddy ("Ruddy Aff."), filed herewith, at ¶¶ 7-8. Shop & Shop's GDC Shop Rules provide, in part:

> *<u>The following offenses will result in disciplinary action up to and including suspension or discharge.</u>* . . . *D. Sleeping on the job.* . . . *H. Dishonesty (includes stealing time).* (Emphasis in original.)

Ex. A, North Haven GDC Shop Rules. In accordance therewith, the Company has discharged each and every GDC employee found sleeping on the job—regardless of that employee's race. Ruddy Aff., ¶ 11.

Pursuant to the grievance procedure provided in the collective bargaining agreement between Stop & Shop and Mr. Bell's union, Local 443 of the Teamsters Union ("Local 443" or the "Union"), an employee could grieve a termination. *See* Collective Bargaining Agreement ("CBA"), attached hereto as Exhibit B, at Article VIII, pp. 4-5. During Step 1 of the grievance process, the aggrieved employee first presented his grievance to the union Shop Steward. *Id.* The Shop Steward then negotiated with the Area Manager or his designee for a resolution of the matter. *Id.* If the parties did not settle the matter, the Shop Steward and employee submitted the grievance to the Union's Business Representative. *Id.* During Step 2 of this process, the Business Representative then took the matter up with the Area Manager or his designee. *Id.* If

3

they failed to negotiate a satisfactory settlement, then the grievance proceeded to Step 3, at which point the matter proceeded to arbitration before the CBMA. *Id.* Once the CBMA issued a decision, the parties accepted the Arbitrator's decision as "final and binding." *Id.*

While Stop & Shop has immediately terminated all GDC employees caught sleeping on the job or stealing time, during the ensuing grievance process, the Union, on occasion, has successfully negotiated on a terminated employee's behalf and convinced Stop & Shop to reinstate the employee. Ruddy Aff., ¶ 14. Indeed, the Company has reinstated the employment of *both white and African-American* employees as a result of such negotiations with the Union during the grievance process. *Id.* at ¶ 15. For instance, Local 443 negotiated the reinstatement of African-American employees Sam Short (initially terminated December 30, 2000 for sleeping on the job), Curtis Jackson (initially terminated February 8, 2000 for stealing time), and Enico Jones (initially terminated May 17, 2002). *Id.* at ¶ 16.

The informal factors Stop & Shop considers when deciding whether to reinstate a terminated employee include without limitation: (i) whether the employee denies committing the infraction, (ii) whether there are witnesses to the infraction, (iii) the employee's seniority, and/or (iv) the employee's previous work history and performance. *Id.* at ¶ 17. An employee's race is not a factor whatsoever. *Id.*

***However, once the grievance process has reached arbitration and the CBMA has issued a "final and binding" decision upholding the termination, Stop & Shop has never reinstated a former employee.*** *Id.* at ¶ 21. For instance, from 1997 through 2003, sixteen (16) GDC employees formally requested to arbitrate their terminations (including all terminations regardless of the reason). *Id.* at ¶ 22. The CBMA upheld Stop & Shop's termination decision in eleven (11) of those cases and overturned the Company's decision in five (5) of those cases. *Id.*

4

Stop & Shop did not reinstate any of the eleven former employees whose termination the CBMA upheld. *Id.*

## II.    Mr. Bell's Employment With Stop & Shop

Stop & Shop hired Mr. Bell as a warehouseman in its Meat Distribution Center ("MDC") in North Haven, Connecticut on or about October 29, 1989. Complaint at ¶¶ 5-6. Upon his hire, Mr. Bell received a copy of the GDC Shop Rules, acknowledging receipt thereof on November 2, 1989, and further acknowledging that he could obtain an additional copy upon request from his union steward at any time. *See* Deposition of Patrick Bell ("Bell Dep."), attached hereto as Exhibit C, at 50-53, 55; Acknowledgement Form, dated November 2, 1989, attached hereto as Exhibit D.

As a warehouseman, Mr. Bell worked as a selector, a utility worker and a highlift operator. Complaint at ¶ 6. In January 1998, Stop & Shop transferred Mr. Bell to the GDC, also located in North Haven, and he began to work as a highlift operator. *Id.* at ¶ 9; Bell Dep. 96-97. As a highlift operator, Mr. Bell operated a machine that moved pallets of merchandise from the truck receiving dock to specific shelves in racks located throughout the GDC warehouse. Ruddy Aff., ¶ 18. The GDC warehouse has eighteen (18) aisles filled with racks of merchandise. *Id.* Once Mr. Bell placed the pallets in the racks, selectors walked through the warehouse aisles filling grocery store orders with specific merchandise from the racks. *Id.*

Throughout Mr. Bell's employment, Stop & Shop supervisors admonished him for numerous infractions, including, but not limited to, failing to meet productivity standards and spending excessive time out of his work area. *Id.* at ¶ 19.

### III. Stop & Shop Terminated Bell's Employment For Sleeping On the Job

On September 1, 2000, Mr. Bell reported to work at 12:00 a.m.[2] Bell Dep. 110. According to Mr. Bell's testimony, he was tired from working a double-shift earlier that week on August 30, 2000. *Id.* at 161-162. At about 4:00 a.m., Mr. Bell drove his highlift down aisle number 62. *Id.* at 115. He claims that he parked his highlift temporarily because there were two selectors working in the aisle, picking up boxes.[3] *Id.* Mr. Bell testified that he stepped off of his highlift and sat on a box on the side of the aisle for about five minutes. *Id.* at 116-117.

When Supervisor Robert Roddy noticed that Mr. Bell was missing from the truck receiving dock at approximately 4:15 a.m., Mr. Roddy searched for Mr. Bell and saw Mr. Bell's high-lift parked in aisle number 62. *See* Affidavit of Robert Roddy ("Roddy Aff."), attached hereto as Exhibit F, at ¶ 10. Believing that Mr. Bell was asleep somewhere in the facility, Mr. Roddy walked approximately 200 yards to the shipping office to find GDC Operations Manager Curt Miller, with whom Mr. Roddy returned to aisle 62 to find Mr. Bell asleep in a double-deep pick slot. *Id.* at ¶¶ 11-17.

Mr. Bell admits that Mr. Roddy said, "I saw you with your eyes closed." Bell Dep. 118, and that Mr. Bell responded, "You'll never catch me sleeping again!" *Id*; Roddy Aff., ¶ 21.[4] According to Mr. Bell's testimony, Mr. Roddy then stated, "No, I saw you [with] your eyes closed. You [were] sleeping. You're fired." Bell Dep. 128. Mr. Bell then punched out on the time clock and left the building. *Id.* at 129.

---

[2] Mr. Bell's work hours at the time were 12:00 a.m. to 8:00 a.m., five days per week. Bell Dep. 106-107.

[3] During his hearing before the Connecticut State Board of Mediation and Arbitration, Mr. Bell initially maintained that there were three selectors in the aisle. *See* Connecticut State Board of Mediation and Arbitration Labor Department Memorandum, dated May 7, 2001 ("Arbitration Decision"), attached hereto as Exhibit E.

[4] Mr. Bell now claims that his eyes were closed for "only a few seconds" when Messrs. Miller and Roddy came upon him. Bell Dep. 117-118, 133-134.

6

Mr. Bell concedes that sleeping on the job was a terminable offense at Stop & Shop. *Id.* at 52-53, 55, 196. Consistent with its strict enforcement of its GDC Shop Rules, Stop & Shop immediately terminated Mr. Bell's employment for sleeping on the job.

### IV. The Arbitration Panel Upheld Mr. Bell's Termination, And Stop & Shop Treated Him In The Same Manner As All Similarly Situated Individuals Whose Terminations Were Upheld By An Arbitrator

Following Mr. Bell's termination, pursuant to the CBA's grievance procedure, Mr. Bell filed a grievance with the Union, contesting his discharge on the grounds that he had not slept on the job. Ruddy Aff., ¶ 20. Indeed, throughout the grievance process, Mr. Bell never claimed that Stop & Shop had terminated his employment because of his race. *Id.* Local 443 represented Mr. Bell during the grievance process. *Id.* However, Stop & Shop did not find Local 443's arguments on Mr. Bell's behalf persuasive because, among other things, two supervisors had found Mr. Bell asleep and Mr. Bell had admitted that he was sleeping. *Id.* As a result, Stop & Shop upheld Mr. Bell's termination during Steps 1 and 2 of the grievance process, and his grievance proceeded to arbitration. *Id.*

During Step 3, Local 443 continued to represent Mr. Bell at his arbitration before the CBMA, during which the Union contended only that (i) Stop & Shop could not prove that Plaintiff had been sleeping and, (ii) Stop & Shop Rules did not require immediate termination for such a violation. On May 7, 2001, the CBMA determined that Stop & Shop had "just cause" to terminate Mr. Bell's employment, thereby upholding his termination. *See* Ex. E, Arbitration Decision.

Accordingly, consistent with its treatment of all employees whose terminations were upheld by the CBMA, Stop & Shop did not reinstate Mr. Bell, nor did Local 443 attempt to negotiate on his behalf at that time. Ruddy Aff., ¶ 26. While Mr. Bell contends that Stop & Shop favored similarly situated Caucasian employees over him, he cannot refute the undisputed

7

fact that Stop & Shop never reinstated any employee whose termination was upheld at arbitration by the CBMA.

## V. Stop & Shop's Termination Was Consistent With Its Discipline Of All Similarly Situated Employees

Mr. Bell further claims that Stop & Shop did not discipline its white employees for violating the Shop Rules, but terminated its African-American employees for committing similar infractions. *Id.* at 29-31, 81, 90,147-156. In response to this specious claim, Stop & Shop has compiled the following chart, which contains the names of Stop & Shop employees whom Stop & Shop has terminated for stealing time from 1995 to the present.

| NAME | TERMINATION | SLEEPING ON THE JOB? | REINSTATED? | RACE |
|---|---|---|---|---|
| Winston Adams | Terminated for Stealing Time | | No | Black |
| Frank Battiste | Terminated for Stealing Time | YES | Opportunity to Reapply | White |
| James Belcourt | Terminated for Stealing Time | | Yes | White |
| James Cole | Terminated for Stealing Time | | No | White |
| Richard Cruz | Terminated for Stealing Time | YES | Yes | Hispanic |
| Yaroslaw Daniw | Terminated for Stealing Time | | Yes/No | White |
| Dion Green | Terminated for Stealing Time | | No | Black |
| Henry Hannible | Terminated for Stealing Time | | No | Black |
| Michael Hasty | Terminated for Stealing Time | YES | No | Black |
| Theodore Holly | Terminated for Stealing Time | YES | No | White |
| Curtis Jackson | Terminated for Stealing Time | | Yes/No | Black |

8

| NAME | TERMINATION | SLEEPING ON THE JOB? | REINSTATED? | RACE |
|---|---|---|---|---|
| Enico Jones | Terminated for Stealing Time | YES | Yes | Black |
| Albert Lindsay | Terminated for Stealing Time | | Yes | White |
| Billy Madden | Terminated for Stealing Time | | No | Black |
| John Martin | Terminated for Stealing Time | YES | No | White |
| Anthony Milano | Terminated for Stealing Time | | Yes/No | White |
| Theron Myers | Terminated for Stealing Time | YES | No | Black |
| Keith Pascale | Terminated for Stealing Time | | Yes | White |
| Roberto Padua | Terminated for Stealing Time | YES | No | Hispanic |
| Massimo Palma | Terminated for Stealing Time | | Yes/No | White |
| Travis Perry | Terminated for Stealing Time | | No | Black |
| Gary Pawlowicz | Terminated for Stealing Time | | Yes | White |
| Herman Saunders | Terminated for Stealing Time | | No | Black |
| Sam Short | Terminated for Stealing Time | YES | Yes | Black |
| Darryl Smith | Suspended pending termination | | Yes | White |
| Tim Spruill | Terminated for Stealing Time | YES | No | Black |
| Mel Younger | Terminated for Stealing Time | YES | Yes | Black |

9

The chart reflects that Stop & Shop strictly enforces its practice of terminating employees whom it finds sleeping on the job without considering an employee's race.[5] Ruddy Aff., ¶ 11. Mr. Bell suggests that Stop & shop rehired certain Caucasian employees after it terminated them for sleeping on the job. Despite Mr. Bell's allegations to the contrary, Stop & Shop has reinstated both white and African-American employees whom it had discharged for sleeping on the job or stealing time as a result of negotiations with their union representatives. *Id.* at ¶¶ 14-15. Specifically, the Local 443 negotiated the reinstatement of Caucasian employees Belcourt, Daniw, Lindsay, Milano, Pascale, Palma, and Pawlowicz. *Id.* at ¶ 16. As discussed above, Local 443 also negotiated the reinstatement of African-American employees Sam Short (initially terminated December 30, 2000 for sleeping on the job), Curtis Jackson (initially terminated February 8, 2000 for stealing time), and Enico Jones (initially terminated July 5, 2001[6]). *Id.*

As discussed above, the Union did not successfully advocate for Mr. Bell's reinstatement during the grievance process, and once the process reached arbitration, the Union did not negotiate with the Company for Mr. Bell's reinstatement. Notwithstanding, Stop & Shop never reinstates employees whose terminations have been upheld in arbitration.

## VI. Stop & Shop Treated Mr. Bell Equally To Similarly Situated Employees During His Employment

Mr. Bell further claims that he perceived that his supervisors scrutinized his performance more carefully than his Caucasian counterparts and that he believes that such strict scrutiny was

---

[5] In one instance, Stop & Shop found Darryl Smith, a white employee, stealing time and suspended him pending a hearing. This incident is distinguishable from Bell's situation. Specifically, on December 12, 1995, Operations Manager Edward McMillan suspended Smith for leaving the premises without punching out to take a shower following his physical therapy with a company therapist. Smith grieved the suspension. During the Step 1 hearing on the matter, Local 443 argued that Smith had made an "innocent mistake." Stop & Shop informed Smith that stealing time is a terminable offense and that further mistakes on his part would result in his immediate termination. Ruddy Aff., ¶ 13.

[6] Stop & Shop permanently terminated Jackson on May 17, 2002 for stealing time on a second occasion.

10

because of his race. However, Mr. Bell cannot introduce any admissible evidence to support this speculative allegation.

### A.   Curt Miller

For example, Mr. Bell testified that Mr. Miller, GDC Operations Manager, had "singled [him] out" because of his race. Specifically, Mr. Bell alleges that he assumes that Mr. Miller directed other supervisors to "follow Bell . . . just Bell." Id. at 21, 24. Mr. Bell also claims that Mr. Miller followed Mr. Bell on the shop floor and monitored Mr. Bell's productivity, but did not monitor the productivity of other employees. Id. at 22-23. Bell produces no evidence of Mr. Miller's alleged discriminatory animus, however, other than his own perceptions of Mr. Miller's conduct and speculation about the cause of such conduct.

During his deposition, Mr. Bell originally stated that supervisors Bill Bernard and Janet Daniew told him that Mr. Miller scrutinized his work because he is African-American. Id. at 23, 34. Mr. Bell later recanted this testimony, and admitted that these supervisors never referred to his race during any discussions with him. Id. at 64. Plaintiff cannot rely on such hearsay and inconsistent assertions to create a genuine issue of fact.

Mr. Bell also claims that Mr. Miller issued him performance warnings because of his race. Id. at 33. Specifically, Mr. Bell contends that on September 21, 1997, Mr. Miller, a Shift Manager at the time, discovered Mr. Bell watching television on an unscheduled break in the cafeteria. In this instance, Mr. Miller gave Mr. Bell a warning stating that such conduct "could be construed as stealing time." See Report of Change Form, incorrectly dated September 21, 1995, attached hereto as Exhibit G. Mr. Bell signed the warning under protest, claiming that supervisor Eric Brown had given him permission to go to the bathroom. Bell Dep. 70-72; Complaint at ¶ 8. Even Mr. Bell admitted that he did not have permission to take a break in the cafeteria.

11

After first testifying that Mr. Miller had never made any comments to him about his race, Mr. Bell later claimed that when Mr. Miller handed him the warning on September 21, 1997, Mr. Miller said "I don't want to hear what that Black guy [has] got to say." Bell Dep. 73. Despite such a claim, Mr. Bell admitted that he never mentioned this comment to any of his supervisors or union representatives. *Id.* at 74, 77-79. Upon further questioning, Mr. Bell even admitted that he could not remember if Mr. Miller had ever made this comment at all. *Id.* at 79.

### B.  Robert Roddy

Similarly, in support of his claims, Mr. Bell testified that his supervisor, Mr. Roddy, "watched him and told him what to do." *Id.* at 157-159. He also testified that Mr. Roddy had threatened him on one occasion by stating "I'm going to get you." *Id.* at 158. Again, upon further questioning, Mr. Bell recanted his testimony and admitted that Mr. Roddy had never made this statement. *Id.* at 158-159.

### C.  Bill Bernard

Mr. Bell also testified that he believed that supervisor Bill Bernard ("Mr. Bernard") gave him performance warnings which he did not deserve. Despite the foregoing, Mr. Bell added that he had no specific recollection of any particular undeserved discipline. *Id.* p. 24. He also claimed that he believes that Mr. Bernard monitored his productivity, but, once again, Mr. Bell could not remember any specifics concerning Mr. Bernard's supervision. *Id.* at 25-26. Mr. Bell testified only that he "believes" that Mr. Bernard monitored his performance because he is black. *Id.* at 25.

### D.  Janet Daniew

Mr. Bell alleges that supervisor Janet Daniew ("Ms. Daniew") discriminated against him based on his race when she gave him a written warning three or four years ago for leaving his

work area. *Id.* at 32. He assumes that Ms. Daniew did not give warnings to white employees who had left their work area, but he admittedly possesses no personal knowledge to support his speculation. *Id.*

### E.   Frank Zappone

Mr. Bell also claims that Frank Zappone ("Mr. Zappone") gave him a warning for being out of his work area on October 29, 1993. *Id.* at 87-88. Mr. Bell claims that Mr. Zappone gave him this warning because of his race, because he never personally saw Mr. Zappone give white employees warnings for similar conduct. *Id.* at 88. Once again, Mr. Bell lacks any knowledge of whether Mr. Zappone gave similar warnings to white employees, and he cannot point to any specific employees or incidents which would support his self-serving contentions.

### F.   Steve Jones

Finally, Mr. Bell testified that supervisor Steve Jones ("Mr. Jones"), who is also black, gave Plaintiff certain performance warnings because of Plaintiff's race. *Id.* at 83-85. Once again, Mr. Bell provides no support for his allegations of disparate treatment.

Accordingly, Stop & Shop did not favor Caucasian employees over Mr. Bell, and he cannot introduce any admissible evidence to prove otherwise.

## ARGUMENT

### I.   THE APPLICABLE SUMMARY JUDGMENT STANDARD AND THE MCDONNELL DOUGLAS STANDARD.

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Bickerstaff v. Vassar College,* 196 F.3d 435, 445 (2nd Cir. 1999); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). "Properly employed, summary judgment

13

allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial." *Frost*, 697 F. Supp. at 83. The plaintiff "must do more than present evidence that is merely colorable, conclusory, or speculative and must present concrete evidence from which a reasonable juror could return a verdict in [his] favor . . ." (Citations omitted; internal quotation marks omitted.) *Page v. Conn. Dept. of Public Safety*, 185 F. Supp. 2d 149, 153 (D. Conn. 2002).

In analyzing claims of racial discrimination under Title VII, the Court must apply the three-step burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, Mr. Bell has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *See Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2nd Cir. 2001). If Mr. Bell establishes a prima facie case, he creates a presumption of discrimination and the burden of production shifts to Stop & Shop to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination. *Id.*

If Stop & Shop fulfills its burden of production, the presumption drops out of the analysis and this Court must grant Stop & Shop summary judgment unless Mr. Bell can prove by a preponderance of the evidence that Stop & Shop's explanation is a pretext for discrimination. *See Farias*, 259 F.3d at 98. More significantly, where, as here, a defendant goes beyond merely articulating a nondiscriminatory reason "to substantiating that reason by proving that it has a sound and factually supported basis, the [plaintiff's] task of showing that this reason was a pretext will be more difficult." *Halbrook v. Reichhold Clems, Inc.*, 766 F. Supp. 1290, 1295 (S.D.N.Y. 1991) (citations omitted).

As demonstrated below, there is no genuine dispute as to any <u>material issue</u> regarding the events in question. Stop & Shop terminated Mr. Bell's employment for sleeping on the job in

14

accordance with its Shop Rules, and the Company did not reinstate him after the CBMA upheld his termination, consistent with its practice concerning all former employees whose terminations were upheld in arbitration. Mr. Bell cannot show that Stop & Shop was racially motivated in terminating his employment. Therefore, the Court should grant Defendant summary judgment on the Plaintiff's Complaint.

## II.  MR. BELL CANNOT ESTABLISH A PRIMA FACIE CASE.

Absent direct evidence of illegal discrimination, a plaintiff must show the following in order to establish a prima facie case of racial discrimination: (1) he was a member of a relevant protected class; (2) he was qualified for and performed satisfactorily in the position; (3) he was subjected to an adverse employment action; and (4) that non-members of the protected class were treated more favorably or the adverse action occurred under circumstances giving rise to an inference of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. Mr. Bell cannot produce any direct evidence of a discriminatory motive. Moreover, he cannot establish a prima facie case of discrimination because he cannot show that Stop & Shop's decision to terminate him occurred under circumstances giving rise to an inference of discrimination.[7]

Mr. Bell cannot show that his supervisors treated similarly situated white employees more favorably when they found such employees violating Shop Rules. In fact, as the chart above clearly depicts, Stop & Shop terminated (and in only one circumstance, suspended) each white employee that Mr. Bell points to as a comparator. The record evidence also shows that stealing time (including sleeping on the job) is a terminable offense under the Shop Rules and that Stop & Shop had a practice of discharging each and every employee whom it found stealing time. For example, as the chart above depicts, Mr. Miller also terminated a white employee,

---

[7] For purposes of this motion, Stop & Shop concedes that Mr. Bell was in a protected class, that he was qualified for his position, and that he suffered an adverse employment action.

15

Frank Battiste, for sleeping on the job. It is clear then that Stop & Shop evenhandedly enforced its practice of terminating employees who committed this infraction.

In an effort to undercut the force of this evidence, Mr. Bell alleges that although Stop & Shop terminated those white employees for the same offense, it later reinstated them. As explained above, Stop & Shop did not reinstate Mr. Bell because the arbitrator upheld his termination and Stop & Shop never reinstates an individual's employment after the CBMA has upheld the termination. Indeed, Stop & Shop did not reinstate all of the eleven former employees whose terminations were upheld in arbitration between 1997 and 2003.

Further, while Stop & Shop reinstated certain white and African-American employees prior to arbitration, it did so <u>only</u> after their union successfully lobbied the Company. The fact that both white and African-American employees were fired <u>and</u> reinstated is direct and irrefutable evidence that Stop & Shop did not discriminatorily enforce its Shop Rules. Therefore, this Court should summarily dismiss Mr. Bell's claims.

### III. MR. BELL CANNOT PROVE THAT STOP & SHOP'S ARTICULATED REASON FOR HIS TERMINATION WAS A PRETEXT FOR DISCRIMINATION.

Even if Mr. Bell could establish a prima facie case, his claim fails because he cannot rebut Stop & Shop's legitimate non-discriminatory explanation for terminating his employment. As set forth above, Stop & Shop terminated Mr. Bell's employment for sleeping on the job in violation of its consistently enforced Shop Rules. Although Mr. Bell claims that he was not sleeping, he admitted that his eyes were "closed" and that when Mr. Miller and Mr. Roddy came upon him he stated: "You'll never catch me sleeping again!" Stop & Shop had a practice of discharging each and every employee for stealing time (including sleeping on the job). Therefore, Mr. Miller and Mr. Roddy were justified in terminating Mr. Bell's employment.

Mr. Bell must produce direct or circumstantial evidence that would rebut this explanation and lead a reasonable fact-finder to conclude that Stop & Shop terminated him because of his race. However, Mr. Bell has failed to introduce a scintilla of admissible evidence to infer that Stop & Shop's articulated reason for his termination was a pretext for race discrimination. *See Farias*, 259 F.3d at 98. In fact, Mr. Bell admitted during his deposition—upon further questioning—that the instances he first pointed as "evidence" of discriminatory animus in fact never occurred. Bell Dep. 64, 73, 77-79, 158-159. Such unsupported speculation is insufficient to meet Plaintiff's burden, and, therefore, Mr. Bell fails to establish a genuine issue of material fact.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for the Defendant on Plaintiff's claims.

Respectfully Submitted,

By Defendant,
THE STOP & SHOP SUPERMARKET COMPANY

Lynn A. Kappelman
Damian W. Wilmot
SEYFARTH SHAW
World Trade Center East
2 Seaport Lane, Suite
Boston, MA 02210
(617) 946-4800

17

## CERTIFICATE OF SERVICE

I, Damian W. Wilmot, hereby certify that, I have, on this January 12, 2004, sent a copy of the foregoing MEMORANDUM IN SUPPORT OF ITS SECOND MOTION FOR SUMMARY JUDGMENT to the following counsel of record, via facsimile and overnight mail:

>Morris J. Busca, Esq.
>GESMONDE, PIETRISIMONE,
>SGRIGNARI & PINKUS, LLC
>3127-3129 Whitney Avenue
>Hamden, CT 06518

_____
Damian W. Wilmot