UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICK B. BELL    :    CIVIL ACTION NO.
                   :    3:01CV01961 (WWE)
Plaintiff,         :
v.                 :
                   :
STOP & SHOP SUPERMARKET :
COMPANY            :
                   :
        Defendant. :    January 12, 2004

## LOCAL RULE 9(C)1 STATEMENT IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 9(c)1, the Defendant Stop & Shop Supermarket Company ("Stop & Shop") states that the following sets forth each material fact as to which there is no genuine issue to be tried in the above-captioned action:

1. On or about October 29, 1989, Plaintiff Patrick Bell ("Mr. Bell) commenced his employment with Stop & Shop as a warehouseman in its Meat Distribution Center ("MDC") located in North Haven, Connecticut. Complaint at ¶ 5-6.

2. As a warehouseman, Mr. Bell worked as a selector, a utility worker and a highlift operator. *Id.* at ¶ 6.

3. On or about January 4, 1998, Stop & Shop transferred Mr. Bell to Stop & Shop's Grocery Distribution Center ("GDC"), also located in North Haven, and he began to work as a highlift operator. *Id.* at ¶ 9; Deposition of Patrick Bell ("Bell Dep.") p. 96-97, dated June 27, 2002.

4. As a highlift operator, Mr. Bell operated a machine which moved pallets of merchandise from the truck receiving dock to specific shelves in racks located throughout the GDC warehouse. Affidavit of Edward Ruddy ("Ruddy Aff."), filed simultaneously herewith, at ¶ 18.

5. The GDC warehouse has eighteen (18) aisles filled with racks of merchandise. Once Mr. Bell placed the pallets in the racks, Selectors walked through the warehouse aisles filling grocery store orders with specific merchandise from the racks. Ruddy Aff., ¶ 18.

6. At the time of his termination in September 2000, Mr. Bell's work hours were 12:00 a.m. to 8 a.m., five days per week. Bell Dep. p. 106-107.

7. Mr. Bell's personnel file reflects that throughout his employment, Stop & Shop supervisors admonished him for numerous infractions, including, but not limited to, failing to meet productivity standards and spending excessive time out of his work area. Ruddy Aff., ¶ 19.

8. Mr. Bell claimed during his deposition that Curt Miller ("Mr. Miller"), GDC Operations Manager, had "singled [him] out" because of his race. Mr. Bell alleges that he believes that Mr. Miller directed other supervisors to "follow Bell . . . just Bell." *Id.* at 21, 24. Mr. Bell also claims that Mr. Miller followed Mr. Bell on the shop floor and monitored Mr. Bell's productivity but he did not monitor the productivity of other employees. *Id.* at 22-23. During his deposition, Mr. Bell originally stated that supervisors Bill Bernard and Janet Daniew told him that Mr. Miller scrutinized his work because he is African-American. *Id.* at 23, 34. Mr. Bell later recanted this testimony, and admitted that these supervisors never referred to his race during any discussions with him. *Id.* at 64.

9. Mr. Bell also claimed that Mr. Miller issued him performance warnings because of his race. *Id.* at 33. Specifically, Mr. Bell complained that on September 21, 1997, Mr. Miller, who was a Shift Manager at the time, discovered Mr. Bell watching television on an unscheduled break in the cafeteria. In this instance, Mr. Miller gave Mr. Bell a warning stating that such conduct "could be construed as stealing time." *See* Report of Change Form, incorrectly dated September 21, 1995. Mr. Bell signed the warning under protest, claiming that supervisor Eric

2

Brown had given him permission to go to the bathroom. Bell Dep. p. 70-72; Complaint at ¶ 8. Even Mr. Bell admitted that he did not have permission to take a break in the <u>cafeteria</u>.

10. After first testifying that Mr. Miller had never made any comments to him about his race, Mr. Bell later claimed that when Mr. Miller handed him the warning on September 21, 1997, Mr. Miller said "I don't want to hear what that Black guy [has] got to say." Bell Dep. p. 73. Despite such a claim, Mr. Bell admitted that he never mentioned this comment to any of his supervisors or union representatives. *Id.* at 74, 77-79. Upon further questioning, Mr. Bell even admitted that he could not remember if Mr. Miller had ever made this comment at all. *Id.* at 79.

11. Mr. Bell also testified that Supervisor Robert Roddy ("Mr. Roddy") had threatened him on one occasion by stating "I'm going to get you." *Id.* at 158. Again, upon further questioning, Mr. Bell recanted his testimony and admitted that Mr. Roddy had never made this statement. *Id.* at 158-159.

12. Mr. Bell also testified that he believed that supervisor Bill Bernard ("Mr. Bernard") gave him performance warnings which he did not deserve. Despite the foregoing, Mr. Bell added that he had no specific recollection of any particular undeserved discipline. *Id.* p. 24. He also claimed that he believes that Mr. Bernard monitored his productivity, but, once again, Mr. Bell could not remember any specifics concerning Mr. Bernard's supervision. *Id.* at 25-26. Mr. Bell testified only that he "believes" that Mr. Bernard monitored his performance because he is black. *Id.* at 25.

13. Mr. Bell alleges that supervisor Janet Daniew ("Ms. Daniew") discriminated against him based on his race when she gave him a written warning three or four years ago for leaving his work area. *Id.* at 32. He states that he does not believe that Ms. Daniew gave

3

warnings to white employees who had left their work area, but he provides no evidence to support this opinion. *Id.*

14.  Mr. Bell also claims that Frank Zappone ("Mr. Zappone") gave him a warning for being out of his work area on October 29, 1993. *Id.* at 87-88. Mr. Bell claims that Mr. Zappone gave him this warning because of his race, because he never saw Mr. Zappone give white employees warnings for similar conduct. *Id.* at 88.

15.  Finally, Mr. Bell testified that supervisor Steve Jones ("Mr. Jones"), who is also black, gave Plaintiff certain performance warnings because of Plaintiff's race. *Id.* at 83-85.

16.  Pursuant to the grievance procedure provided in the collective bargaining agreement between Stop & Shop and the employees' union, Local 443 of the Teamsters Union ("Local 443" or the "Union"), an employee could grieve a termination. During Step 1 of the grievance process, the aggrieved employee first presented his grievance to the union Shop Steward. The Shop Steward then negotiated with the Area Manager or his designee for a resolution of the matter. If the parties did not settle the matter, the Shop Steward and employee submitted the grievance to the Union's Business Representative. During Step 2 of this process, the Business Representative then took the matter up with the Area Manager or his designee. If they failed to negotiate a satisfactory settlement, then the grievance proceeded to Step 3, at which point the matter proceeded to arbitration before the Connecticut State Board of Mediation and Arbitration ("CBMA"). Once the CBMA issued a decision, the parties accepted the Arbitrator's decision as "final and binding." Ruddy Aff., ¶ 6.

17.  Stop & Shop's practice is to discharge each and every employee who is found sleeping on the job—regardless of that employee's race. Ruddy Aff., ¶ 11.

18.  Shop & Shop's Shop Rules state:

> **The following offenses will result in disciplinary action up to and including suspension or discharge.** . . . D. Sleeping on the job. . . . H. Dishonesty (includes stealing time). (Emphasis in original.)

Ruddy Aff., ¶ 8.

19.  Mr. Bell acknowledges that he received these Shop Rules on November 2, 1989, and that he could obtain an additional copy upon request from his union steward at any time. *See* Acknowledgement Page signed by Patrick Bell, dated November 2, 1989; *see also* Bell Dep. p. 50-53, 55.

20.  On Friday, September 1, 2000, Mr. Bell reported to work at 12:00 a.m. Bell Dep. at 110.

21.  Mr. Bell testified that he was tired from working a double-shift earlier that week on Wednesday, August 30, 2000. *Id.* at 161-162.

22.  When Mr. Roddy noticed that Mr. Bell was missing from the truck receiving dock at approximately 4:15 a.m., Mr. Roddy searched for Mr. Bell and saw Mr. Bell's high-lift parked in aisle number 62. *See* Affidavit of Robert Roddy ("Roddy Aff.") ¶ 10, filed January 30, 2003.

23.  Believing that Mr. Bell was asleep somewhere in the facility, Mr. Roddy walked approximately 200 yards to the shipping office to find Mr. Miller, and he and Mr. Miller returned to aisle 62 to find Mr. Bell sleeping in a double-deep pick slot. Id. at ¶ 11-17.

24.  Mr. Roddy informed Mr. Bell that he was being terminated for sleeping on the job. Bell Dep. p. 118.

25.  Mr. Bell admits that he responded, "You'll never catch me sleeping again!" *Id;* Roddy Aff., ¶ 21.

26.  Mr. Bell acknowledged during his deposition that sleeping on the job was a terminable offense at Stop & Shop. Bell Dep. at 52-53, 55, 196.

27.     Stop & Shop terminated the following Caucasian employees for stealing time: Frank Battiste, James Belcourt, James Cole, Yaroslaw Daniw, Theodore Holly, Albert Lindsay, John Martin, Anthony Milano, Keith Pascale, Massimo Palma, and Gary Pawlowciz. Ruddy Aff., ¶ 12.

28.     In one instance, Stop & Shop found Darryl Smith, a white employee, stealing time and suspended him pending a hearing. On December 12, 1995, Operations Manager Edward McMillan suspended Mr. Smith for leaving the premises without punching out to take a shower following his physical therapy with a company therapist. Mr. Smith grieved the suspension. During the Step 1 hearing on the matter, Local 443 argued that Mr. Smith had made an "innocent mistake." Stop & Shop informed Mr. Smith that stealing time is a terminable offense and that further mistakes on his part would result in his immediate termination. Ruddy Aff., ¶ 13.

29.     While Stop & Shop has immediately terminated all GDC employees caught sleeping on the job or stealing time, during the ensuing grievance process, the employees' union, Teamsters Local 443 ("Local 443"), on occasion, has successfully negotiated on a terminated employee's behalf and convinced Stop & Shop to reinstate the employee. Ruddy Aff., ¶ 14.

30.     As a result of such negotiations with Local 443 during the grievance process, Stop & Shop has reinstated both white and black employees whom it had discharged for sleeping on the job or stealing time." Ruddy Aff., ¶ 15.

31.     For instance, Local 443 negotiated the reinstatement of African-American employees Sam Short (initially terminated December 30, 2000 for sleeping on the job), Curtis Jackson (initially terminated February 8, 2000 for stealing time), and Enico Jones (initially terminated May 17, 2002). Local 443 also negotiated the reinstatement of Caucasian employees

6

James Belcourt, Yaroslaw Daniw, Albert Lindsay, John Milano, Keith Pascale, Massimo Palma, and Gary Pawlowicz. Ruddy Aff., ¶ 16.

32. The informal factors Stop & Shop considers when deciding whether to reinstate a terminated employee include without limitation: (i) whether the employee denies committing the infraction, (ii) whether there are witnesses to the infraction, (iii) the employee's seniority, and/or (iv) the employee's previous work history and performance. An employee's race is not a factor Stop & Shop considers in determining whether to reinstate the employee. Ruddy Aff., ¶ 17.

33. Stop & Shop terminated Mr. Bell's employment on September 1, 2000 for sleeping on the job. Ruddy Aff., ¶ 19.

34. Pursuant to the collective bargaining procedures, Local 443 represented Mr. Bell and assisted him in filing his grievance contesting his termination. However, Stop & Shop did not find Local 443's arguments on Mr. Bell's behalf persuasive because, among other things, two supervisors found Mr. Bell sleeping and Mr. Bell admitted that he was sleeping. As a result, Stop & Shop upheld Mr. Bell's termination during Steps 1 and 2 of the grievance process, and his grievance proceeded to arbitration. Mr. Bell did not argue during the grievance process or at the arbitration in this matter that his race was a factor in Stop & Shop's termination decision. Ruddy Aff., ¶ 20.

35. Once the grievance process has reached arbitration and the CBMA has issued a "final and binding" decision upholding the termination, Stop & Shop has never reinstated a former employee. Ruddy Aff., ¶ 21.

36. For instance, from 1997 through 2003, sixteen (16) GDC employees formally requested to arbitrate their terminations (including all terminations regardless of the reason). The CBMA upheld Stop & Shop's termination decision in eleven (11) of those cases and overturned

the Company's decision in five (5) of those cases. Stop & Shop did not reinstate any of the eleven former employees whose termination the CBMA upheld. Ruddy Aff., ¶ 22.

37. Pursuant to the Collective Bargaining Agreement between Stop & Shop and Local 443, Mr. Bell and Local 443 brought Mr. Bell's termination before the CBMA. The CBMA found in favor of Stop & Shop and upheld Mr. Bell's termination. Ruddy Aff., ¶ 25.

38. Consistent with its treatment of all employees whose terminations were upheld by the CBMA, Stop & Shop did not reinstate Mr. Bell, nor did Local 443 attempt to negotiate on his behalf at that time. Ruddy Aff., ¶ 26.

Respectfully Submitted,
By Defendant,
THE STOP & SHOP SUPERMARKET COMPANY

_____
Lynn A. Kappelman
Damian W. Wilmot
SEYFARTH SHAW
World Trade Center East
2 Seaport Lane, Suite
Boston, MA 02210
(617) 946-4800

## CERTIFICATE OF SERVICE

I, Damian W. Wilmot, hereby certify that, I have, on this January 12, 2004, sent a copy of the foregoing document to the following counsel of record, via first class mail:

_____
Damian W. Wilmot

8

BO1 15620657.1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT           FILED

| | |
|---|---|
| PATRICK B. BELL, | : CIVIL ACTION NO. |
| | : 3:01CV01961 (WWE) |
| Plaintiff, | : |
| v. | : |
| | : |
| STOP & SHOP SUPERMARKET | : |
| COMPANY, | : |
| | : January 12, 2004 |
| Defendant. | : |

## AFFIDAVIT OF EDWARD RUDDY

I, Edward Ruddy, being duly sworn, depose and state:

1. I am over 18 years of age and understand the obligation of an oath.

2. I submit this Affidavit in support of the Stop & Shop Supermarket Company's ("Stop & Shop" or the "Company") Motion for Summary Judgment in the above-captioned matter.

3. I base the information contained herein on my own personal knowledge.

4. I attest that the documents attached to Stop & Shop's Memorandum of Law In Support of its Second Motion for Summary Judgment are true and accurate copies of documents that the Company maintained in the normal course of business.

5. I am the Director of Distribution for Stop & Shop. As Director of Distribution, my responsibilities include, but are not limited to, managing Stop & Shop's Grocery Distribution Center ("GDC") and the Meat Distribution Center ("MDC").

6. Pursuant to the grievance procedure provided in the collective bargaining agreement between Stop & Shop and the employees' union, Local 443 of the Teamsters Union ("Local 443" or the "Union"), an employee could grieve a termination. During Step 1 of the grievance process, the aggrieved employee first presented his grievance to the union Shop Steward. The Shop Steward then negotiated with the Area Manager or his designee for a resolution of the matter. If the parties did not settle the matter, the Shop Steward and employee submitted the grievance to the Union's Business Representative. During Step 2 of this process, the Business Representative then took the matter up with the Area Manager or his designee. If they failed to negotiate a satisfactory settlement, then the grievance proceeded to Step 3, at which point the matter proceeded to arbitration before the Connecticut State Board of Mediation and Arbitration ("CBMA"). Once the CBMA issued a decision, the parties accepted the Arbitrator's decision as "final and binding."

7. Under Stop & Shop's Shop Rules, stealing time (or sleeping on the job) is a terminable offense in both the GDC and the MDC.

8. In fact, Shop & Shop's Shop Rules state: "The following offenses will result in disciplinary action up to and including suspension or discharge. . . . D. Sleeping on the job. . . . H. Dishonesty (includes stealing time)."

9. The Company provides each new employee in either the MDC or the GDC a copy of the Shop Rules. The Company also posts a copy of the Shop Rules conspicuously in each Center on the wall next to the punch clock. Employees also know that they can request a copy of the Shop Rules from their union steward at any time.

10. Stop & Shop gave Patrick Bell ("Mr. Bell") a copy of the Shop Rules on November 2, 1989.

11. It is Stop & Shop's practice to discharge each and every employee who sleeps on the job (or steals time)—regardless of that employee's race. The Company strictly enforces this practice.

12. For example, Stop & Shop has terminated the following Caucasian employees for stealing time: Frank Battiste, James Belcourt, James Cole, Yaroslaw Daniw, Theodore Holly, Albert Lindsay, John Martin, Anthony Milano, Keith Pascale, Massimo Palma, and Gary Pawlowciz.

13. In one instance, Stop & Shop found Darryl Smith, a white employee, stealing time and suspended him pending a hearing. On December 12, 1995, Operations Manager Edward McMillan suspended Mr. Smith for leaving the premises without punching out to take a shower following his physical therapy with a company therapist. Mr. Smith grieved the suspension. During the Step 1 hearing on the matter, Local 443 argued that Mr. Smith had made an "innocent mistake." Stop & Shop informed Mr. Smith that stealing time is a terminable offense and that further mistakes on his part would result in his immediate termination.

14. While Stop & Shop has immediately terminated all GDC employees caught sleeping on the job or stealing time, during the ensuing grievance process, the employees' union, Teamsters Local 443 ("Local 443"), on occasion, has successfully negotiated on a terminated employee's behalf and convinced Stop & Shop to reinstate the employee.

15. As a result of such negotiations with Local 443 during the grievance process, Stop & Shop has reinstated both white and black employees whom it had discharged for sleeping on the job or stealing time."

16. For instance, Local 443 negotiated the reinstatement of African-American employees Sam Short (initially terminated December 30, 2000 for sleeping on the job), Curtis Jackson (initially terminated February 8, 2000 for stealing time), and Enico Jones (initially terminated May 17, 2002). Local 443 also negotiated the reinstatement of Caucasian employees James Belcourt, Yaroslaw Daniw, Albert Lindsay, Anthony Milano, Keith Pascale, Massimo Palma, and Gary Pawlowicz.

17. The informal factors Stop & Shop considers when deciding whether to reinstate a terminated employee include without limitation: (i) whether the employee denies committing the infraction, (ii) whether there are witnesses to the infraction, (iii) the employee's seniority, and/or

(iv) the employee's previous work history and performance. An employee's race is not a factor Stop & Shop considers in determining whether to reinstate the employee.

18. At the time of Mr. Bell's termination, he worked as a highlift operator in the GDC. As a highlift operator, Mr. Bell operated a machine that moved pallets of merchandise from the truck receiving dock to specific shelves in racks located throughout the GDC warehouse. The GDC has eighteen (18) aisles filled with racks of merchandise. Once Mr. Bell placed the pallets in the racks, selectors walked through the warehouse aisles filling grocery store orders with specific merchandise from the racks.

19. Throughout Mr. Bell's employment, Stop & Shop supervisors admonished him for numerous infractions, including, but not limited to, failing to meet productivity standards and spending excessive time out of his work area. Stop & Shop terminated Mr. Bell's employment on September 1, 2000 for sleeping on the job.

20. Pursuant to the collective bargaining procedures, Local 443 represented Mr. Bell and assisted him in filing his grievance contesting his termination. However, Stop & Shop did not find Local 443's arguments on Mr. Bell's behalf persuasive because, among other things, two supervisors found Mr. Bell sleeping and Mr. Bell admitted that he was sleeping. As a result, Stop & Shop upheld Mr. Bell's termination during Steps 1 and 2 of the grievance process, and his grievance proceeded to arbitration. Mr. Bell did not argue during the grievance process or at the arbitration in this matter that his race was a factor in Stop & Shop's termination decision.

21. Once the grievance process has reached arbitration and the CBMA has issued a "final and binding" decision upholding the termination, Stop & Shop has never reinstated a former employee.

22. For instance, from 1997 through 2003, sixteen (16) GDC employees formally requested to arbitrate their terminations (including all terminations regardless of the reason). The CBMA upheld Stop & Shop's termination decision in eleven (11) of those cases and overturned the Company's decision in five (5) of those cases. Stop & Shop did not reinstate any of the eleven former employees whose termination the CBMA upheld.

23. I have attached to my affidavit a summary of all of the instances where the CBMA upheld the Company's termination decision after a formal arbitration. This summary depicts that Stop & Shop did not reinstate any of these employees.

24. I attest that the information contained in the attached summary was compiled using true and accurate records maintained in the normal course of business by Stop & Shop.

25. Pursuant to the Collective Bargaining Agreement between Stop & Shop and Local 443, Mr. Bell and Local 443 brought Mr. Bell's termination before the CBMA. The CBMA found in favor of Stop & Shop and upheld Mr. Bell's termination.

26. Consistent with its treatment of all employees whose terminations were upheld by the CBMA, Stop & Shop did not reinstate Mr. Bell, nor did Local 443 attempt to negotiate on his behalf at that time.

*[signature]*
Edward Ruddy
Director of Distribution
Stop & Shop Supermarket Company

Subscribed and sworn to
before me this 12th day of January 2004.

*[signature: Gail B. Fulop]*
~~Commissioner of the Court~~ /Gail B. Fulop/
Notary Public
My Commission Expires Aug. 31, 2007

*[notary seal]*

BO1 15620149.1                              4